VSC /03.04.26
WM/DW/GB: 2025R00088



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * |
| v. | * CRIMINAL NO. DLB26CR86 |
| | * |
| KEVIN MANUEL ORELLANA | * (Conspiracy to Participate in the |
| AMAYA, a/k/a "Once (11)," and | * Affairs of an Enterprise through a |
| JORGE ALBERTO TORRES | * Pattern of Racketeering Activity, |
| ALVAREZ, a/k/a "City Gangster," | * 18 U.S.C. § 1962(d); |
| | * Forfeiture, 18 U.S.C. § 1963, |
| Defendants. | * 21 U.S.C. § 853(p), 28 U.S.C. § 2461(c)) |
| | * |
| | * |
| ****** | |

USDC- GREENBELT
'26 MAR 5 AM 11:51

## INDICTMENT

### COUNT ONE
(Conspiracy to Participate in the Affairs of an
Enterprise through a Pattern of Racketeering Activity)

The Grand Jury for the District of Maryland charges that:

At all times relevant to this Indictment:

**The Enterprise**

1. *La Mara Salvatrucha*, also known as the MS-13 gang ("MS-13"), was a gang composed primarily of immigrants or descendants of immigrants from El Salvador, with members operating in the State of Maryland, the Commonwealth of Virginia, and throughout the United States.

2. The name "Mara Salvatrucha" was a combination of several slang terms. The word "Mara" was the term used in El Salvador for "gang." The phrase "Salvatrucha" was a combination of the words "Salva," which was an abbreviation for "Salvadoran," and "trucha," which was a slang term for "fear us," "look out," or "heads up."

3. In the United States, MS-13 has been functioning since at least the 1980s. MS-13 originated in Los Angeles, California, where MS-13 members banded together for protection against the larger Mexican groups. MS-13 quickly spread to states across the country, including Maryland.

4. MS-13 was a national and international criminal organization and was one of the largest street gangs in the United States. Gang members actively recruited members, including juveniles, from communities with large numbers of immigrants from El Salvador and other Central American countries.

5. Defendants **KEVIN MANUEL ORELLANA AMAYA ("ORELLANA")** and **JORGE ALBERTO TORRES ALVAREZ ("TORRES")** were members and associates of MS-13.

6. MS-13 members and associates referred to one another by their "gang names," or monikers, and often did not know fellow gang members and associates except by their monikers. **ORELLANA**'s moniker within MS-13 and his MS-13 clique was "Oncé" or 11, and **TORRES**'s moniker within MS-13 and his MS-13 clique was "City Gangster."

7. Members and associates of MS-13 were expected to protect the name, reputation, and status of the gang from rival gang members and other persons. MS-13 required that all individuals, including its own members and associates, show respect and deference to the gang and its membership. To protect the gang and to enhance its reputation, MS-13 members were expected to use any means necessary, including acts of intimidation and violence, to force respect from those perceived to have shown disrespect toward the gang, its members and associates.

8. Members and associates of MS-13 frequently engaged in criminal activity, including, but not limited to, acts involving murder, assault, and dealing in illegal controlled

substances. MS-13 members and associates were required to commit acts of violence to maintain membership and discipline within the gang, as well as against rival gang members. Participation in criminal activity by a member or associate, particularly in violent acts directed at rival gangs or as directed by gang leadership, increased the respect accorded to that member or associate, resulted in that member or associate maintaining or increasing his position in the gang, and opened the door to a promotion to a leadership position. One of the principal rules of MS-13 was that its members, and persons seeking to become members, must attack and kill rivals whenever possible. In Maryland, MS-13 maintained a rivalry with the 18th Street Gang, among others. Another principal rule of MS-13 was that its members must never cooperate with law enforcement. Violation of this rule resulted in an order of death for the offender.

9. There were membership ranks within MS-13.[1] Some of the membership ranks from lower to higher, respectively, were "paro," "observation," "chequeo," and "homeboy." To move up in rank, members were required to prove their worthiness by "putting in work," which included committing crimes for, or on behalf of, MS-13. As a member advanced in rank, they were often required to commit more serious criminal activity to advance further within the gang. For example, generally to advance to homeboy, a member had to commit at least one murder. The names and numbers of membership ranks, however, could vary with different cliques, as could the requirements to advance in rank. For example, some cliques used the names of "ayudante" and "futuro" for the respective ranks before becoming a homeboy. After proving worth sufficient to become a homeboy, the member was required to complete an initiation process, often referred to as being "jumped in" or "beat in" to the gang. During that initiation,

---

[1] The terms "member" and "MS-13 member and associate" as used in this Indictment, includes all membership ranks within MS-13.

other members of MS-13 would beat the prospective homeboy member, until a gang member finished counting aloud to the number thirteen, representing the "13" in MS-13.

10. MS-13 was an international criminal organization and was organized in Maryland and elsewhere into "cliques," that is, smaller groups operating in a specific city or region. Cliques operated under the umbrella rules of MS-13. MS-13 cliques often worked together cooperatively to engage in criminal activity and to assist one another in avoiding detection by law enforcement. In Maryland, Virginia, and the District of Columbia, cliques of MS-13 included the Cabanas Locos Salvatrucha, Las Vegas Locos Salvatrucha, Hollywood Locos Salvatrucha, and Via Satellite Locos Salvatrucha cliques.

11. Defendants **ORELLANA** and **TORRES** were members and associates of the Cabanas Locos Salvatrucha ("Cabanas") clique of MS-13.

12. Each clique was presided over by the "First Word," the leader or president of the clique. The leader was also referred to as "Primero Palabra," or "Shotcaller," or "Corredor," or "Runner." Some cliques had a "Second Word," or "Segundo Palabra," who was the second-in-command of the clique. General members were required to take and follow orders from the First Word or Runner and Second Word. **TORRES** was the Second Word of the Cabanas clique in Maryland.

13. MS-13 cliques kept in contact and reported to the supreme runners for their respective cliques, who were often based in El Salvador. Cliques contacted their leaders based in El Salvador using mobile telephones to keep them updated on gang business, for advice, and to resolve disagreements regarding operations among local cliques. Clique leaders in El Salvador directed orders to cliques in Maryland and elsewhere, and cliques often transferred money from the United States to clique leaders in El Salvador.

14. MS-13 members and associates met on a regular basis to, among other things, discuss gang affairs and report on acts of violence committed by their members with the goal of inciting and encouraging further violence. Each clique held clique meetings where business specific to that clique was discussed. Any perceived indiscretions by members and associates for violations of MS-13 rules were discussed at clique meetings, and punishments known as "courts" or "violations" were issued. Courts or violations often took the form of beatings by fellow MS-13 members. More serious violations resulted in the issuance of a "green light." A green light was an order and/or approval to kill.

15. MS-13 received money and income from various sources, including member dues and the sale of controlled substances. Such funds were then used for gang purposes, including obtaining weapons and providing support for incarcerated MS-13 gang members, both inside and outside of Maryland.

16. MS-13 members and associates communicated about gang activities with other MS-13 members and associates in Maryland and elsewhere using mobile telephones, text messages, social media such as Facebook, Instagram and WhatsApp, e-mail accounts, and other modes of communication. MS-13 members and associates used transnational and international money wire transfers to conduct and promote gang activities.

### The Enterprise

17. MS-13, including its leaders, members, and associates, constituted an enterprise as defined in 18 U.S.C. § 1961(4), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce ("the Enterprise" or "the MS-13 Enterprise"). The Enterprise constituted an ongoing organization whose members and associates functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise.

**Purposes of the Enterprise**

18. The purposes of the MS-13 Enterprise included, among other things:

    a. Preserving and protecting the power, territory, and profits of the Enterprise through the use of intimidation and violence, including assaults, murders, and threats of violence;

    b. Promoting and enhancing the Enterprise and its members' and associates' activities, including advancement in rank and reputation in return for adhering to the rules and expectations of the Enterprise;

    c. Enriching members and associates of the Enterprise through trafficking in controlled substances, money laundering, and other illegal activities;

    d. Keeping victims and potential witnesses in fear of the Enterprise and in fear of its members and associates through threats of violence and actual violence;

    e. Providing assistance to members and associates who committed crimes on behalf of the Enterprise and financial assistance to incarcerated members and associates of the Enterprise; and

    f. Hindering, obstructing, and preventing law enforcement officers from identifying participants in the Enterprise's criminal activity, from apprehending the perpetrators of those crimes, and from successfully prosecuting and punishing the offenders.

**Means and Methods of the Enterprise**

19. Among the means and methods by which members and associates conducted and participated in the conduct of the affairs of the MS-13 Enterprise were the following:

    a. MS-13 members and associates met and communicated about, among other things, the structure and organization of the gang; past criminal acts committed against rival gang members and others; MS-13 members and associates who were arrested or incarcerated; disciplining of MS-13 members and associates including the severity of the

discipline; police interactions with MS-13 members and associates; the identities of individuals suspected of cooperating with law enforcement and the proposed actions to be taken against them; plans and agreements regarding the commission of future crimes, as well as ways to conceal these crimes; the circulation and sale of firearms between and among MS-13 members; and the enforcement of gang rules.

      b.    MS-13 members and associates agreed to purchase, maintain, and circulate weapons and firearms for use in criminal activity by MS-13 members.

      c.    MS-13 members and associates agreed to purchase and distribute controlled substances and use proceeds from the sales to benefit the gang.

      d.    MS-13 members and associates received money and income from sources including the distribution of controlled substances and dues payments from members and associates. Such funds were used for gang purposes such as obtaining weapons and providing support for MS-13 gang members, including those imprisoned in the United States (inside and outside of Maryland) and in El Salvador.

      e.    MS-13 members and associates agreed that acts involving murder, including conspiracy and attempts to commit murder, and other acts of violence, would be committed by members and associates of MS-13 against rival gang members and persons deemed as threats to MS-13 and for the purpose of imposing discipline within the gang, and on other occasions as deemed necessary.

      f.    MS-13 members and associates would investigate rival gang members or other persons targeted for violence; would obtain information about such targets, including locations frequented by them; and would use such information in their plans to attack such targets.

**The Racketeering Conspiracy**

20. Beginning on a date in or about 2023, and continuing through at least in or about January 14, 2025, in the District of Maryland and elsewhere, the defendants,

**KEVIN MANUEL ORELLANA AMAYA,**
a/k/a "Once (11)," and
**JORGE ALBERTO TORRES ALVAREZ**
a/k/a "City Gangster,"

together with others known and unknown, each being a person employed by and associated with MS-13, an enterprise engaged in, and the activities of which affected, interstate and foreign commerce, did knowingly and intentionally conspire and agree to violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the MS-13 Enterprise through a pattern of racketeering activity, as defined in 18 U.S.C. §§ 1961(1) and (5), which pattern of racketeering activity consisted of:

    a. multiple acts involving murder, chargeable under Md. Code Ann., Crim. Law §§ 2-201, 2-204, 2-205, 2-206, 1-201, and 1-202, and the Common Law of Maryland, punishable pursuant to Md. Code Ann., Crim. Law §§ 1-201, 1-202, 2-201, 2-204, 2-205, and 2-206;

    b. multiple offenses involving drug trafficking, in violation of 21 U.S.C. §§ 841 and 846; and

    c. multiple acts indictable under 18 U.S.C. § 1956 (relating to laundering of monetary instruments).

21. It was further part of the conspiracy that **ORELLANA** and **TORRES** agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

## Overt Acts

22. In furtherance of the conspiracy and to affect the object thereof, **ORELLANA** and **TORRES** and co-conspirators committed the following acts, among others, within the District of Maryland and elsewhere:

   a. Between January 2023 and December 2024, **ORELLANA** collected money owed to the Cabanas clique from member dues and controlled substance distribution. During this time period, **ORELLANA** made and received electronic monetary transfers to and from members of the Cabanas clique, including the clique First Word, who was residing in or around Richmond, Virginia.

   b. Between January 2023 and December 2024, **TORRES** and other members of the Cabanas clique made and received electronic monetary transfers for the benefit of the Cabanas clique, including transfers to the clique First Word.

   c. Between January 2023 and December 2024, Victim-1 was a member of the Cabanas clique who, among other things, transported controlled substances for the clique in and around Maryland, Virginia and to the clique First Word, who was located in or around Richmond, Virginia. During the same time period, Victim-1 also made electronic monetary transfers to, and for the benefit of, the clique First Word.

   d. On or about November 14, 2024, the Cabanas clique First Word sent electronic messages to Victim-1 stating, among other things, his displeasure with Victim-1's lack of commitment to the clique and that the clique was going to pay him a visit "at his house."

   e. On or about November 15, 2024, **ORELLANA** and **TORRES**, and another MS-13 member, drove to Victim-1's residence in Oxon Hill, Maryland, for reasons that included correcting Victim-1's lack of commitment to the clique.

f. On or about November 16, 2024, the Cabanas clique First Word sent several threatening electronic messages to Victim-1 because Victim-1 had electronically withdrawn $500 from **ORELLANA**'s bank account to repay Victim-1 for an unpaid loan Victim-1 had made to **ORELLANA**. The Cabanas clique leader said that the money Victim-1 had taken was clique money and must be returned by 5:00 p.m. The following is a translation of one of the messages sent by the clique First Word: "Stupid boy, return the money that you took from El 11, you asshole, if not, we're going to fuck you up asshole, you and your girl. Remember that you got her pregnant. You have until 5 PM asshole, if not, be mindful where you take her and where you go, asshole. You think we're playing, you'll see."

g. On or about November 16, 2024, **ORELLANA**, **TORRES** and members and associates of the Cabanas clique planned to murder Victim-1 for reasons that included his lack of commitment to MS-13 and taking and not returning the Cabanas clique's money.

h. On or about November 16, 2024, **ORELLANA**, **TORRES** and members of the Cabanas clique obtained and possessed firearms to be used to murder Victim-1.

i. On or about November 16, 2024, in Oxon Hill, Maryland, **ORELLANA** and **TORRES**, while intending to retaliate against Victim-1, shot and killed Victim-2.

**Special Sentencing Factors**

23. As part of their agreement to conduct and participate in the conduct of the affairs of the MS-13 enterprise through a pattern of racketeering activity, the defendants committed the following acts:

24. On or about November 16, 2024, in the District of Maryland, **ORELLANA** and **TORRES** unlawfully conspired with each other and others known and unknown to the Grand Jury to feloniously, willfully, and with deliberately premeditated malice, murder Victim-1, in

violation of Maryland Code, Criminal Law §§ 2-201(a)(1) and 2-201(c) and the Common Law of Maryland, and punishable pursuant to Maryland Code, Criminal Law §§ 2-201(b) and 1-202.

      25.    On or about November 16, 2024, in the District of Maryland, **ORELLANA** and **TORRES** feloniously, willfully, and with deliberately premeditated malice, murdered Victim-2, in violation of Maryland Code, Criminal Law §§ 2-201(a)(1) and the Common Law of Maryland, and punishable pursuant to Maryland Code, Criminal Law §§ 2-201(b).

18 U.S.C. § 1962(d)

## FORFEITURE ALLEGATION

The Grand Jury for the District of Maryland further finds that:

1. Pursuant to Fed. R. Crim. P. 32.2, notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C. §1963, 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c), in the event of the defendant's conviction on Count One of this Indictment.

### RICO Forfeiture

2. Upon conviction of the offense set forth in Count One of this Indictment, the defendants,

**KEVIN MANUEL ORELLANA AMAYA,**
a/k/a "Once (11)", and
**JORGE ALBERTO TORRES ALVAREZ**
a/k/a "City Gangster,"

shall forfeit to the United States, pursuant to 18 U.S.C. § 1963(a):

    a. any interest acquired or maintained in violation of 18 U.S.C. § 1962;

    b. any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which the defendants established, operated, controlled, conducted, or participated in the conduct of, in violation of 18 U.S.C. § 1962; and

    c. any property constituting, or derived from, any proceeds obtained, directly or indirectly, from racketeering activity in violation of 18 U.S.C. § 1962.

### Substitute Assets

3. If, as a result of any act or omission of the defendant, any such property subject to forfeiture:

    a. cannot be located upon the exercise of due diligence;

12

  b. has been transferred or sold to, or deposited with, a third person;

  c. has been placed beyond the jurisdiction of the Court;

  d. has been substantially diminished in value; or

  e. has been commingled with other property which cannot be divided without difficulty,

the United States, pursuant to 18 U.S.C. § 1963(m) and 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), shall be entitled to forfeiture of substitute property up to the value of the forfeitable property described above.

18 U.S.C. § 1963
21 U.S.C. § 853(p)
28 U.S.C. § 2461(c)

*Kelly O. Hayes/DMW*
Kelly O. Hayes
United States Attorney

A TRUE BILL:

**SIGNATURE REDACTED**  Date: 3/5/26

Foreperson